## CHARLESTON.

HARRISON B. SMITH *et als. v.* J. B. CASTO *et als.*

(No. 6351)

Submitted January 15, 1929.   Decided February 5, 1929.

2

4

*Harper & Baker, S. P. Bell, Oscar L. Hall* and *Price, Smith & Spilman,* for appellants.

*Eakle & Eakle, Rummel, Blagg & Stone, Hogg & Hogg, Thomas P. Ryan* and *Poffenbarger & Poffenbarger,* for appellees.

MAXWELL, JUDGE:

This suit involves title to an undivided seventeen-thirty-sixths of the oil and gas in a tract of 245 acres of land in Clay county. The plaintiffs having encountered in the circuit court an adverse decree to their claim of title to said property prosecute this appeal.

On the 16th day of August, 1858, Mary Wallback sold and conveyed to Benjamin H. Smith and George W. Smith (unrelated) a tract of 10,899 acres of land in Clay county. Subsequent to the said acquisition of title and prior to the year 1883 the said grantees, within their joint lives, and later the said Benjamin H. Smith and B. D. Williams, executor of the last will of said George W. Smith, who died in 1860, sold and contracted to sell to different persons at various times twenty-four separate parcels out of said large boundary, and

on the 2nd day of March, 1883, the said Benjamin H. Smith and Williams, executor as aforesaid, conveyed to Alvin Devereaux and O. D. Stockley the said large boundary of land excepting therefrom the said twenty-four parcels of land theretofore sold, which said exception included a tract of 245 acres which had been sold or contracted to be sold to one W. H. Moore. Within the next few years deeds were executed for nineteen of the twenty-four excepted tracts, and of the five for which deeds were not executed three were in Clay county, and the Moore tract was one of the three. The said three tracts of land were assessed as 468 acres and were returned delinquent for non-payment of taxes for the year 1898 and were sold at public sale by the sheriff of Clay county to J. B. Casto December 18, 1899. September 1, 1900, E. C. Smith, administrator with the will annexed of George W. Smith, deceased, and Harrison B. Smith, attorney-in-fact for the devisees of Benjamin H. Smith, deceased, sold and undertook to convey the said five tracts of land to W. S. Lewis. This deed contains an oil and gas exception and reservation which the plaintiffs interpret to be an exception of one-half of said minerals. This suit is an assertion of title by the plaintiffs to the said excepted one-half of the oil and gas, less a one-thirty-sixth as to which Flora A. Wetzel and Benjamin C. Smith later released their rights, if any they had, as hereinafter more fully noted. On the 24th day of January, 1901, the said Casto obtained from W. T. Hamrick, clerk of the county court of Clay county, a deed, dated December 28, 1900, purporting to be for the said three tracts of land which he had purchased at the tax sale the preceding fall, but as a matter of fact the boundaries contained in said deed embraced only the said tract of 245 acres. Some time after receiving this deed, Casto instituted an ejectment suit against Moore and obtained in said suit a judgment for the possession of the said tract. Moore surrendered possession of the property to Casto under the judgment of the court on the 1st day of January, 1905.

About the time of the pendency of the ejectment suit, Casto evidently set about to obtain a deed for the other two parcels of land which he claimed he had bought at the tax sale in

the fall of 1899. At any rate, in the summer of 1904, Lewis instituted a chancery suit in the circuit court of Clay county against Casto and one James Reed, then clerk of the county court of said county, to cancel the deed which Casto had received from county clerk Hamrick for the 245 acre tract, and to enjoin county clerk Reed from making and executing any deed or deeds to Casto for the other two parcels claimed by him. Lewis' suit was predicated on his claim of title under the deed which had been executed to him by E. C. Smith and Harrison B. Smith September 1, 1900. On the 23rd day of June, 1905, the circuit court of Clay county entered a decree, in confirmation of a report of one of its commissioners in chancery to whom the said cause had been referred, holding that Lewis was entitled to redeem the said other two tracts of land consisting of 129½ acres and 97 acres, respectively, upon payment to Casto of the sums due on his purchase at the tax sale of the said two tracts; and further adjudging that Lewis was not entitled to redeem the said tract of 245 acres known as the W. H. Moore tract, but that the title of the said last mentioned tract was vested in the said J. B. Casto. On the 23rd day of March, 1912, Casto and wife executed to the Poca Valley Bank a deed of trust on said property to secure the sum of $2,000.00. This trust was duly recorded in the office of the clerk of the county court of Clay county on the 27th day of March, 1912. By deed dated October 2, 1913, Casto and wife conveyed to one H. W. Alford an undivided one-eighth interest in the oil and gas within and underlying the said tract of land; and by deed dated the 15th day of November of the same year, Casto and wife conveyed to one David Morrison an undivided three-eighths interest of all the oil and gas in and underlying said tract of land. In the years 1916 and 1917 Casto and his assigns by separate instruments undertook to lease to the United Fuel Gas Company all of the oil and gas in the said tract of land. On the 4th day of August, 1919, Casto (his wife being dead) conveyed the said tract of land to James Reed and E. R. Reed, defendants, excepting therefrom one-half of the oil and gas, subject to the oil and gas leases then on said land. These several instruments were all duly re-

corded in the office of the clerk of the county court of Clay county. By indenture dated the 1st day of May, 1922, the United Fuel Gas Company conveyed to the defendant, Virginian Gasoline & Oil Company, all of the rights of the grantor in and to the oil in and under the said tract of land. A little later, and prior to 1925, the United Fuel Gas Company and the Virginian Gasoline & Oil Company transferred and assigned to the defendant, Ohio Fuel Oil Company, the interests of the said assignors in the southwestern half of said tract of 245 acres for oil and gas development purposes. In 1925 the Virginian Gasoline & Oil Company and the Ohio Fuel Oil Company entered upon the said property and drilled and completed producing oil wells. Under an agreement entered into on the 14th day of October, 1925, between the plaintiffs to this suit and the Virginian Gasoline & Oil Company and the Ohio Fuel Oil Company, the plaintiffs agreed that the said companies should be permitted to continue their operations upon said land for oil and gas and be permitted to continue to produce the same therefrom; and in consideration therefor, the said companies agreed to deliver to the plaintiffs, other than W. C. Lewis and May L. Roberts, a one-sixteenth part of thirty-five thirty-sixths of the oil produced from said land. It was further agreed that if the plaintiffs should recover the said land or any part thereof, the royalties provided to be paid under the terms of these leases under which the said companies were operating should be paid by the said companies to the plaintiffs as their interest might be adjudicated and determined, in addition to the royalties provided for in the said contract. W. C. Lewis and May L. Roberts are children and sole heirs at law of W. S. Lewis, hereinbefore mentioned. They claim that under the above mentioned deed of September 1, 1900, of E. C. Smith, administrator, and Harrison B. Smith, attorney-in-fact, to W. S. Lewis they are entitled to the equal one-sixteenth part of all oil produced from said land and one-half of the net proceeds from all the gas marketed therefrom. By deed dated the 10th day of June, 1926, James Reed and E. R. Reed and others claiming under the Casto title, granted and conveyed unto Flora A. Wetzel and Ben C. Smith an undivided three-

five-hundred and twelfths and to Charles E. Hogg and Robert L. Hogg an undivided one-five hundred and twelfth of the oil and gas in and underlying the above mentioned tract of land, in consideration whereof the said grantees undertook to sustain and defend the Casto title. It is to be noted that by this arrangement Flora A. Wetzel and Ben C. Smith severed their allegiance from the plaintiffs in the prosecution of this suit, and therefore the plaintiffs do not claim the full one-half interest in the oil and gas in said property such as they would claim if Mrs. Wetzel and Ben C. Smith were standing with them. The joint interest of Mrs. Wetzel and Ben C. Smith under the title which the plaintiffs assert would be an undivided one-thirty-sixth of the whole oil and gas. The plaintiffs therefore assert title to an undivided seventeen thirty-sixths. This suit was instituted in 1926. As will be seen, the plaintiffs rely on the Smith-Lewis title while the defendants rely on the hostile Casto title.

The plaintiffs claim that although a contract of sale was entered into in 1880 by the Smiths with William H. Moore for the 245 acre tract aforesaid, that he later abandoned his purchase and became a tenant at will of the Smiths. They adduce the testimony of M. B. Smith who says that when he was a young man about twenty years of age, he went with his uncle, Everett C. Smith, to see Moore at his home on the land in the fall of 1898, and that on the occasion of that visit his uncle demanded of Moore that he surrender the possession of the property, but Moore insisted that he did not have any place to go and it was arranged between the parties that Moore should remain on the property as a tenant of the Smiths for a reasonable length of time thereafter in consideration that he would pay the taxes on the land. This testimony of M. B. Smith is not very satisfactory. For example, he says that he and his uncle drove on that occasion to the home of Moore in a two-horse rig, while there is in the record testimony of witnesses who at that time lived in the neighborhood of the Moore land which was on Grannies creek, and they say that there was then no public road to the Moore land. One witness in answer to a question as to whether there "was any road leading to the W. H. Moore tract of land that could be

traveled with a wagon or vehicle'' in 1898, replied: ''They would have quite a bit of difficulty in getting in there if they did.'' Further he says: ''Well, from the forks of Grannies Creek up there wasn't any road at all, you might say, only just a mule path or bridle path.'' And again: Q. ''To the forks you say there was no road that might be used or could be used by a vehicle such as a wagon or buggy'' A. ''I don't think there was.'' He further says that from the mouth of Grannies creek to the Moore tract was a distance of from six to eight miles. On cross-examination: Q. ''But you would not say it was impossible to have done so, would you?'' A. ''Of course it wasn't impossible, I don't suppose.'' Q. ''You do not know whether persons went there with buggies or not at that time?'' A. ''I didn't see anyone went there.'' * * * Q. ''There was a road passing along his residence or near his residence, wasn't there?'' A. ''There was no road there; just a path.'' Another of these witnesses testified: ''No, there was no wagon road or anything of that kind. A riding path, I would call it.'' A third of these witnesses in response to an inquiry as to whether there was a public road up and down the creek at that time replied, ''No, sir; no, sir.'' On cross-examination this witness testified as follows: Q. ''You would not say people could not travel there with a two horse wagon and buggy?'' A. ''No, sir, because we went over pretty rough places at that time.'' Q. ''For anything you know to the contrary people might have used it for that purpose?'' A. ''They might have done it but I never saw it. I would not want to undertake it.'' The recollection of Mr. M. B. Smith of the surrounding and attending circumstances on the occasion of the trip about which he testifies is very indefinite. The following questions and answers on cross-examination will illustrate: Q. ''I wish you would state what kind of a looking house that was he lived in at that time'' A. ''Well, I couldn't say.'' Q. ''Was it a one story or two story house?'' A. ''Well, I couldn't say that. All I know it was a house.'' Q. ''Log or frame house?'' A. I couldn't say that. ''Q. ''How close the road was it?'' A. ''Well, I wouldn't know that.'' * * * Q. ''Was it near any

water course, that house?'' A. ''Well, now, I couldn't tell you.'' * * * Q. ''Can you describe the main road you travelled in going there?'' A. ''I could not.'' * * * Q. ''Was the road in the creek or out of the creek?'' A. ''I couldn't tell you that.'' Q. ''Was the road in the bottom or on the hillside?'' A. ''I couldn't tell you where it was at.'' Q. * * * ''Did you go up or down the creek when you left?'' A. ''I couldn't answer the question.'' In the light of the above recited testimony, it seems not improbable that the visit which the witness and his uncle made was, in fact, to the home of some person other than Moore.

Moore never received a deed from the Smiths, but there is substantial evidence of payments made by him from time to time on his debt to the Smiths. The initial payment of $25.00 is admitted; the record warrants the belief that he turned over to the Smiths three horses at different times to be credited on the purchase money for the land. There is evidence of other payments but it is indefinite. That he in fact entirely paid for the land is not evident from the record, but many years have elapsed since these transactions took place, and it is to be expected that they would now be clouded with uncertainty. And, in the absence of evidence that he did not pay for the land those who now assert the benefits of the Moore possession and title are entitled to the presumption that arises after twenty years that the consideration was discharged by him. This common law rule of presumption of payment was recognized and applied by JUDGE EDWIN MAXWELL in the case of *Edwards* v. *Chilton*, 4 W. Va. 352. We find it in many subsequent West Virginia cases, for example, in *Roush* v. *Griffith*, 65 W. Va. 752, 761, the court says: ''Payment will be presumed, as matter of fact, both at law and in equity, after the lapse of twenty years, provided the creditor labors under no disability.''

According to the contention of the plaintiffs the final payment by Moore under his contract of purchase was due in February, 1894. Thus, not only twenty years but, in fact, thirty-two years elapsed from that time until in this suit the discharge by Moore of the obligations of his contract was challenged by the plaintiffs. It is generally stated that third

parties may not claim the benefit of the common law presumption of payment. 30 Cyc., 1274. But the defendants are not third parties in the sense of being strangers to the Moore title. True, the Moore title was never perfected by the making and delivery of a deed to him, and in that sense the defendants do not claim under him; but they do claim the benefit of his equitable title as destructive of plaintiffs' claim of co-tenancy with Casto and those claiming under him. We find the principle of presumption of payment after twenty years referred to as a matter for defense, but not for aggressive action. 30 Cyc., 1274; 21 R. C. L., p. 132; *Ellison* v. *Torpin,* 44 W. Va. 414. But, even so, the defendants here are not using the presumption ''as a sword of aggression.'' They are on the defense. They say, in effect, to the claimants, ''Your assertion that Moore had no title contravenes the twenty-year presumption that Moore paid the purchase money for which he was obligated, and we rely on that presumption because we claim the benefit of the equitable title of Moore.''

It will be remembered that Moore did not yield up the land because of failure on his part to meet the obligations of his contract of purchase, but because the Smiths in whom the land was assessed for taxation had permitted it to be returned delinquent and sold for taxes and Casto had in due time come in with a tax deed. We are not concerned, therefore, with a presumption of payment arising in Moore's favor as of the time he yielded possession to Casto, (in fact, sufficient time had not then expired to give rise to the presumption, and it was not our intention in the original draft of this opinion to discuss the presumption as of that date, though it seems that the phraseology then employed led counsel for plaintiffs so to believe, as indicated by their petitions for rehearing), but we are concerned with the presumption operative as of the time of the institution of this suit when plaintiffs for the first time assert a co-tenancy with Casto under his tax deed. If Moore paid for the land under his contract of purchase, he was the beneficial owner thereof to the full exclusion of the Smiths, and there is therefore no basis on which they can predicate such co-tenancy. In this situation the de-

fendants are entitled to the benefit of the presumption as of the time indicated.

It is true that in the case of *Townshend* v. *Shaffer*, 30 W. Va. 176, wherein there was an unqualified attack on a tax deed, this Court held: "In a suit by a person assessed with taxes for land, against the purchaser of such land for taxes, to set aside a tax deed to such purchaser, the latter cannot, in such suit, controvert the right of the person so charged with taxes for which the land was sold to redeem the land." Inasmuch, however, as the plaintiffs in this case, although attacking the Casto tax deed, in the alternative rely upon the same, because they say they were co-tenants of Casto's wife and that the Casto purchase should be considered as a redemption for the benefit of all of them, if is not improper for the defendants to deny the Smith title to refute the theory of co-tenancy, if for no other reason. The following excerpts from the first amended and supplemental bill will throw light on this situation: "And the plaintiffs further allege * * * that said irregularities (meaning the alleged irregularities in the delinquency proceedings and sale) are of such nature as to render the deed so attempted to be made to said Casto absolutely null and void." And further: "Plaintiffs further show * * * that such pretended purchase on the part of the said J. B. Casto amounted only to a redemption of said lands from said delinquency;" and that "* * * each of the plaintiffs herein who are co-tenants in said land, as aforesaid, individually and separately as well as all of said co-tenants collectively, elects to treat said tax sale and purchase as a redemption of said lands and elects to claim the benefit thereof." We are of opinion that the evidence and the circumstances warrant the conclusion that Moore was the equitable owner of this land when it was returned delinquent in the name of the Smiths in 1898; and that the Smiths then and now having no beneficial interest in this property are not entitled to assert a co-tenancy with Casto and his assigns.

Casto's wife was Sally A. Smith, a granddaughter of George W. Smith, one of the original grantees of said land under the conveyance from Mary Wallback. Plaintiffs therefore take the position that when Casto acquired his tax title

to the Moore tract, as above recited, it was, in fact, a redemption by him for the benefit of the Smith heirs, or that he held in trust for them, under the well established doctrine that a co-tenant or the husband or wife of a co-tenant who acquires the forfeited title of such co-tenancy does so for the benefit of all parties in interest. *Cline* v. *Bailey,* 85 W. Va. 139; *Abbott* v. *Williams,* 74 W. Va. 652. This position is not well taken, in the first place, because if the equitable title and estate in this property was in Moore, the Smiths in consequence held the naked legal title merely and could have no beneficial interest in the Casto purchase; and in the second place, because, if the above stated conclusion as to the then beneficial title is not well taken, and if the Smiths had a beneficial interest in the property and could have looked to the Casto purchase as being for their benefit, they have slept on their rights. It was incumbent on them to come in and share the expense with Casto and assert their claim. In *Abbott* v. *Williams, supra,* the law is stated that for such co-tenants ''to avail themselves of that right, before or after deed, each co-tenant must within a reasonable time after notice of such purchase, make his election to claim the benefit thereof, and come in and repay or contribute to the purchaser his proper proportion of all taxes, interest, costs and damages paid or incurred since the date of the purchase.'' Other cases state the same rule; among them *Cecil* v. *Clark,* 44 W. Va. 659. No one of the Smith claimants ever sought in any manner to avail himself of the benefit of the Casto purchase; in fact, they paid no attention to the property whatever until the institution of his suit subsequent to the discovery of oil on the property in 1925.

Nor are the children and heirs at law of Sallie A. Casto in any better situation than the other plaintiffs in this particular. They claim the benefit of the principle announced in syllabus one in the case of *Fuller* v. *Edens,* 70 W. Va. 248. ''A husband cannot acquire valid title to his wife's land by becoming a purchaser thereof at tax sale and taking a tax deed therefor.'' The facts were these: A husband permitted the lands of his first wife to become delinquent for non-payment of taxes and to be sold by the sheriff. The husband

became the purchaser, and later conveyed the land to his second wife through the intermediary of her father. In the opinion of the Court JUDGE ROBINSON rightly said: ''Besides the whole transaction reflects an effort by fraud and collusion to put the property of the first wife beyond the reach of her children, so as to be beneficial to the second wife.'' How different the facts in this case! Here we find acquiescence of the wife in the tax title of her husband as contradistinguished from an effort to defraud her or her heirs as in the *Fuller-Edens* case. If it be true, as contended, that no affirmative action was necessary on her part to entitle her to the benefit of the alleged redemption, through her husband's tax title, of her undivided interest in the property, the corollary is also true, namely, that her conduct must not have been inconsistent with the claim now asserted by her heirs in reliance upon the redemption. It will be remembered that her husband's tax deed bore date December 28, 1900. On the 23rd day of March, 1912, she joined with him in the execution of a deed of trust on the land embraced in his tax title to secure a debt of his to a bank. In the trust the land is referred to as the same tract of land conveyed to the said J. B. Casto by W. S. Hamrick, Clerk. In the fall of 1913 she joined with her husband in conveying to Alford and Morrison, one-eighth and three-eights, respectively, in the oil and gas within and underlying said land, and again the land is referred to as the land that was conveyed to J. B. Casto by W. S. Hamrick, County Clerk. This repeated recognition of her husband's title, the fact that there is not a scintilla of evidence to indicate that she claimed the benefit of her husband's tax purchase as a redemption of her interest, and the further fact that for nearly ten years after her death her heirs made no such claim, taken together, disclose a situation wherein it would be inequitable and unjust to those persons who have in good faith relied on the Casto title to permit her heirs at this late date to assert the benfit of their mother's one time right to claim that her husband's tax title to the extent of her interest should be deemed a redemption.

The plaintiffs say, however, that they had no notice of the Casto purchase and that before they can be bound by the re-

quirements of the rule of *Abbott* v. *Williams,* such notice must have been brought home to them. The law requires notice. The cases cited recognize that rule, and there are many others to the same effect. But let us examine this question of notice. The deed from Hamrick, clerk, to Casto was duly recorded the 24th day of January, 1901. It is not necessary for us to inquire into the effect of that recordation because, in our opinion, the record of this case shows that the plaintiffs had actual notice of the Casto purchase and his assertion of title. Following the resignation in the year 1898 of B. D. Williams, executor of the last will of George W. Smith deceased, E. C. Smith was constituted and appointed administrator with the will annexed of said estate. On the 1st day of March, 1900, plaintiff, Harrison B. Smith, was appointed attorney-in-fact by the devisees of Benjamin H. Smith, deceased, with full power and authority to do all things on their behalf which they might themselves do in connection with the real estate devised to them by their said ancestor. As already stated, these two men, representing all of the said interests, made a deed to W. S. Lewis, September 1, 1900, for five tracts of land, one of which is the Moore tract of 245 acres here involved. Mr. Harrison B. Smith was not active in the affairs of these estates pertaining to the Clay county lands. He says: ''So far as I was concerned as representing the heirs of B. H. Smith, the entire matter was in the hands of Mr. Clay Smith (meaning C. C. Smith).'' Following the death of the latter in 1898, it seems that E. C. Smith became the active representative of the Smith interests in connection with these matters, though Mr. Harrison B. Smith remained the attorney-in-fact for the B. H. Smith devisees. Mr. Henry B. Davenport, who was attorney for Lewis in the latter's chancery suit against Casto, testified in the present case as a witness on behalf of the defendants. He gave evidence with reference to two notes that had been given by Lewis to the Smiths in part consideration for the five tracts of land above mentioned. He testified: ''E. C. Smith held two notes of Judge Lewis' for about $550.00 each with accrued interest. * * * The agreement (meaning the agreement which preceded the entry of the

final decree in the said chancery suit) was that Judge Lewis was to pay Casto $100.00 and E. C. Smith was to surrender to Judge Lewis and cancel those notes. * * * It is my recollection that the compromise was based upon an agreement upon the part of E. C. Smith to cancel those notes. That was a part of the consideration of the compromise whereby Casto was decreed the 245 acre tract.'' On cross-eamination he said: ''I do not know of myself whether the notes were ever cancelled.'' And further, ''The decree entered was a compromise decree. That is, it was agreed before it was entered what the terms would be and what payment was to be made to Casto and what notes were to be cancelled.'' The decree of the court followed. These occurrences must be held to have brought home to the said grantors—administrator and attorney-in-fact, respectively—full notice of the hostile Casto title as to the 245 acre tract of land. Of course, notice to these two fiduciaries must be imputed to their respective principals. As already noted, subsequent conveyances, leases and a deed of trust of Casto were duly placed of public record, whereunto the plaintiffs could not be wholly indifferent after the Casto hostile title had been brought to their attention in the manner aforesaid.

But the plaintiffs assert that there were gross irregularities in the delinquency proceedings which led up to the tax deed by county clerk Hamrick to Casto. These alleged irregularities cannot now be considered because, if the Smiths were in position by timely action to attack the said proceedings and sale, they have long ago lost their rights to such procedure. Laches bars their claim. For more than twenty years the plaintiffs permitted the Casto tax title to remain unchallenged, during all of which time there was no attempt at possession by any of the plaintiffs nor by any person claiming under them, and for at least a considerable portion of the time, if not in fact for practically all of the time, possession was asserted by persons claiming under Casto or by those whom the surrounding circumstances warrant the belief were his tenants. Within the whole period many changes bearing on the title have taken place. Innocent third parties, paying valuable consideration, have become interested in the prop-

erty. The discovery of oil has changed the property from "wild land" of doubtful value to an area of great wealth producing capacity. We have here not only the lapse of many years through which the claim of the plaintiffs remained undemanded but we have a situation of conspicuous inaction which has resulted to the disadvantage of other persons. It is axiomatic that equity does not favor stale demands, and where no excuse is shown for long delay equity will not interfere. *McMullin* v. *Matheney*, 104 W. Va. 317; and a multitude of cases of this and other jurisdictions. Plaintiffs, however, seek to show excuse for their delay. They allege that it is only since the discovery of oil on said tract of land that the true condition of the title thereto has come to the attention of the plaintiffs. And as a further excuse why laches should not be charged against them, it is alleged that since 1899 when the land was returned delinquent for the non-payment of taxes a number of the plaintiffs have lived outside of the state of West Virginia and were ignorant of the tax sale and purchase. Doubtless some of these plaintiffs, probably many of them, were ignorant of the tax delinquency and sale. But as already noted, the knowledge that E. C. Smith, administrator, certainly had, and which must be charged to Harrison B. Smith, attorney-in-fact, is imputed to them. And again, parties who through indifference and neglect remain ignorant of their possible rights for a quarter of a century and then seek to establish a neglected and abandoned title cannot be sustained in a court of equity when their assertion of such alleged title would operate harmfully to other, and innocent, people.

There is another barrier, constitutional, insurmountable. The 245 acre tract of land in question disappears from the land books in the name of Lewis or the Smiths subsequent to the year 1904. From that year to the institution of this suit no taxes have been paid on this land nor any interest therein by the Smiths or any one in privity with them. The Smith title long ago forfeited to the State for non-entry on the land books for purposes of taxation. "And when for any five successive years since the ninth day of April, one thousand eight hundred and seventy-three, the owner of any tract or

lot of land, less in quantity than one thousand acres, shall not have been charged on such books with state tax on said land, then by operation of law and without any proceedings therefor, the land shall be forfeited and the title thereto vested in the state." Code, Chapter 31, section 39. At all times since 1900 this property has been assessed under the Casto title and taxes paid thereon. Even if the Casto tax deed were void (a matter not decided), it was sufficient to give color of title, and thereunder Casto and those claiming under him are vested by constitutional provision with the forfeited Smith title.

> "All title to lands in this State heretofore forfeited, or treated as forfeited, waste and unappropriated, or escheated to the. State of Virginia, or this State, or purchased by either of said States at sales made for the non-payment of taxes and become irredeemable, or hereafter forfeited, or treated as forfeited, or escheated to this State, or purchased by it and become irredeemable, not redeemed, released or otherwise disposed of, vested and remaining in this State, shall be, and is hereby transferred to, and vested in any person (other than those for whose default the same may have been forfeited or returned delinquent, their heirs or devisees), * * * for so much of said land as such person shall have had claim to and actual continuous possession of, under color of title for any five successive years after the year 1865, and have paid all State taxes charged or chargeable thereon for said period." Constitution of West Virginia, Article 13, section 3.

*State* v. *Sommers*, 77 W. Va. 675; *State* v. *Harman*, 57 W. Va. 447; *Jarrett* v. *Osborne*, 84 W. Va. 559, syl. 7.

Concomitant with these considerations is the holding of this Court in the case of *State* v. *West Branch Lumber Co.*, 64 W. Va. 673, wherein the law is thus stated in the syllabus: (1) "Though failure of a former owner of land, conveyed by a fatally defective tax deed, made pursuant to a sale by a sheriff for delinquency, to keep the land taxed in his own name and pay the taxes for a period of five successive years, works a forfeiture of the title, the deed is conclusive evidence against the state that the title of the former owner is in the

tax deed grantee, and she cannot maintain a suit to sell the land as forfeited.'' (2) ''Section 29 of chapter 31 of the Code, by estopping the state from proceeding against the grantee in a fatally defective tax deed, to enforce a forfeiture in the name of the former owner, releases or grants such forfeited title to such grantee in advance of the accrual of the forfeiture.''

In the body of the opinion at page 702, in discussion of section 29 of Chapter 31 of the Code, the following pertinent observations are made: ''If the former owner permits a forfeiture of his title, after the execution of the tax deed, the state, by this statute, passes it to the grantee in the deed by a release or grant thereof. Though the statute does not say this in terms, it necessarily implies such grant. * * * The forfeiture occurs, but this statute immediately passes the benefit of it to the tax deed purchaser. The former owner may prevent the forfeiture by keeping the land taxed and the taxes paid, and so remain in a position to assail and set aside the deed, if it be void, but, if he neglect this for five successive years, his title is irretrievable lost by the forfeiture and the grant thereof to the purchaser effected by this statute.''

The primary fallacy of the plaintiff's position lies, first, in an erroneous assumption that the Smiths were able on September 1, 1900, to convey title to Lewis and to make an effective mineral exception from the conveyance, and secondly, on a misinterpretation of the bearing of the Lewis and Casto chancery suit in 1904. Plaintiffs say that that suit was settled by compromise and that as a result thereof ''Casto became the owner of the Lewis interest in this Moore 245 acre tract, viz. the surface of said land, and of one-half of the oil and gas therein, which had been conveyed to Lewis by E. C. Smith, administrator with the will annexed, and Harrison B. Smith, attorney-in-fact, by said deed of September 1, 1900.'' Plaintiffs' claim is predicated on the supposed one-half of the oil and gas excepted and reserved in the last mentioned deed of the Smiths to Lewis, and, as they say, which did not pass to Casto under the suit aforesaid. The final decree, entered in said chancery suit June 23, 1905, and predi-

cated on the preliminary agreement about which Mr. Davenport testified, adjudicates that Lewis was entitled to redeem from Casto the two tracts of 129½ acres and 97 acres, respectively, involved in said suit, and in this opinion already mentioned, and the title to said two tracts of land was declared vested in the said Lewis; and further it was "adjudged, ordered and decreed that the plaintiff (Lewis) is not entitled to redeem the tract of 245 acres known as the W. H. Moore tract, and described in the bill and exhibits therewith filed; but the title of this tract is declared to be vested in the said J. B. Casto." Thus it appears that Casto did not thereby become vested with merely "the surface of said land, and of one-half of the oil and gas therein which had been conveyed to Lewis," as claimed by the plaintiffs, but that he in fact was thereby declared to be vested with the title to the said land, that is in its entirety.

One important matter remains. After the institution of the instant suit, the commissioner of school lands of Clay county instituted a chancery suit for the purpose of selling the oil and gas and other minerals underlying the tract of land in question as having been purchased by the state at a sale thereof in 1904 for the non-payment of taxes for the year 1902. That suit was finally determined by a decree entered the 29th day of March, 1927, pursuant to an agreement made and entered into on the 17th day of February between E. G. Pierson, commissioner of school lands, acting for the State of West Virginia, and the defendants thereto. Under said instrument it was agreed that the commissioner in chancery to whom the said cause had been referred might "find and report that the plaintiff (meaning the State of West Virginia) never acquired, and does not have any title to the said tract of land by forfeiture, purchase for tax delinquency, or otherwise." Plaintiffs in the suit at bar take the position that "the defendants are estopped from asserting a forfeiture in this suit by reason of the final decree entered in the case recently pending in the circuit court of Clay county of the State of West Virginia against Smith and others, in which it was adjudicated and decreed that the tract in controversy was not and never had been forfeited

to the State of West Virginia.'' That position will not stand, because the said suit was predicated on an alleged delinquency for non-payment of taxes for the year 1902, and the agreement and decree aforesaid must both be construed as having reference merely to that alleged delinquency.

In the light of the foregoing, we are of opinion that the decree of the circuit court ought to be affirmed.

*Affirmed.*