LUCY TOOLE ET AL., APPELLEES, V. DEWEY M. LAWRENCE, APPELLANT: ALICE LAWRENCE ET AL., APPELLEES.

14 N. W. 2d 607

FILED MAY 26, 1944. No. 31786.

*William E. Shuman,* for appellant.

*E. H. Evans, contra.*

Heard before SIMMONS, C. J., PAINE, CARTER, MESSMORE, YEAGER and WENKE, JJ.

PAINE, J.

This was an equitable action for an accounting to quiet title and for equitable relief. The court found generally for plaintiffs, and one of the defendants appeals.

The record shows that Emma V. Mathewson died the owner of a small two-room house, which was located upon lot 6, block 6, Graceland's Addition to North Platte; that she died intestate December 30, 1925, while a resident of Rock county, Nebraska, and that the said lot was inherited

by her six children; that Leon W. Mathewson, one of the six children, and the only one residing in North Platte, took charge of the property, but he died intestate on April 2, 1938, and his interest was inherited by his four daughters, one of them being the plaintiff Lucy Toole, and another is her sister, Alice Lawrence, a defendant herein, each of whom is therefore the owner of a 1/24th interest in said property.

The evidence disclosed that, by the death of the grandmother, Emma V. Mathewson, and also by the death of several of her heirs, the title to this small house and lot in the outskirts of the city of North Platte finally vested in many persons who had inherited interests in the ownership thereof, and that these parties were scattered in several states.

Exhibit No. 4 is an escrow agreement, addressed to McDonald State Bank, dated January 15, 1937, accompanied by a warranty deed, each of them signed by 15 heirs, giving Leon W. Mathewson the power to perfect the title, sell the property, and divide the proceeds between the heirs, for which work it provides he shall receive no compensation whatever, but he died before he could complete a sale of the property for the benefit of all of these heirs.

The court finds in the decree that the lot was foreclosed for taxes by Lincoln county, and that subsequent thereto and in May, 1941, while Alice Lawrence was in possession of said premises and collecting the rents therefor, Dewey M. Lawrence, her husband, who was living with her as her husband, purchased the assignment of the bid of Lincoln county, and the sale was confirmed in him as assignee, and sheriff's deed issued to said Dewey M. Lawrence under date of July 30, 1941, and three weeks thereafter, on August 20, 1941, he contracted to sell the said property to Walter A. Quinn for $700, who paid $100 down and entered into possession of said property under said contract, and thereafter paid the remainder of the purchase price in the full sum of $700 principal and $26.97 interest.

Dewey M. Lawrence testified that the purchase of the lot from the county was his own private investment, and

his wife knew nothing about it until he told her. He said, "It wouldn't have been any investment of mine to throw my money in the pool for twenty-seven heirs."

It is necessary to examine in detail the evidence as to who was in charge of renting this house while the taxes were allowed to become delinquent.

The real estate agent whom Leon W. Mathewson had employed to have charge of the place continued to collect the rents for May and June, 1938. Thereupon Alice Lawrence, defendant, took charge of renting the property, and continued to rent it at $10 a month until August 15, 1941, a period of over three years, but made no distribution of the rents she collected to the other heirs.

She testified that she opened an account in the name of Mrs. D. M. Lawrence, and the first deposit was made November 8, 1939, $7, when Mr. Jackson was in the house. She testified: "Like I say, none of them ever came over with $10.00 at a time, and I would save, keep little dribbles until I would get enough to pay me to go to the bank and then I would bank it." The bankbook showed only deposits of a total of $74, and against this deposit she had drawn personal checks, saying: "When I wrote the checks I thought a reasonable fee for taking care of the property— In fact, Mr. Toole told me that himself, and it was $1.00 a month, so that is the reason I felt free to write some personal checks, and thought if the time would come when we were to settle with the heirs that if they were not entirely satisfied with that I would be glad to refund them."

She testified that her husband had written two receipts for rent when she was back east, and that he had taken care of some of the estate business downtown, the same as the rest of the heirs.

The court found in the decree that Alice Lawrence while in possession of said property collected rents thereon in the sum of $220 over and above pay for her services and repairs expended by her, which balance she holds in trust for the owners of said property, of whom she is one. Upon judgment being entered against her, she paid the amount of

$220 into court for distribution among the heirs. It is clear that she did not use any of this money to pay off the delinquent taxes for the year 1935, assessed in the amount of $9.18, upon which delinquent taxes her husband finally secured a sheriff's deed to the premises.

Louis B. Toole testified generally that about 30 days before the property went to tax sale he was over at Lawrence's home and talked to him and his wife, "and he said being there was so many heirs in it, it would be the best to let it go through tax foreclosure and buy it and divide it up that way."

Dewey M. Lawrence on direct examination testified in regard to Mr. Toole: " * * * he came over to the house several times, and he kept talking about somebody was going to get that place down there and he was helpless. He said 'I have got no money, and I can't do anything about it, why don't you do something?' and I was busy on the road that time of the year, and it kind of got on my mind, and the last time he came over he had his car, and I said 'How much is against it,' and he said 'Let's run down and see,' and so we did, and we went in and I was a little surprised to see there was that little against it, so I laid down my own personal check and said 'protect.' That is, in other words I would like to have first chance on it from Mr. Davis."

Exhibit No. 19 was a check, dated May 21, 1941, for $78.65, to the clerk of the district court and signed by Dewey M. Lawrence. Exhibit No. 20 is the sheriff's deed issued for said check to Dewey M. Lawrence, which on its face shows that in case No. A-1807 there was due from Arthur James Mathewson upon said real estate the sum of $10.79 with interest at 7 per cent from November 5, 1938, together with attorney's fees of $1.07 and costs taxed at $49.

The original petition in the case at bar was filed September 4, 1941, by Lucy Toole, plaintiff, against Dewey M. Lawrence, Alice Lawrence, his wife, and Walter A. Quinn, the purchaser of this lot under contract from Dewey M. Lawrence. On May 19, 1942, the case came on for trial, and the court held that the plaintiff could not maintain action on

behalf of her several cotenants, and continued the cause so that she might make all of such cotenants parties to the suit, and an amended petition was filed August 17, 1942, bringing in all of the heirs.

Among the exhibits we find letters written by Alice Lawrence just a few days after the court continued the case to bring in all the heirs. Exhibit No. 22 is dated May 26, 1942, and exhibit No. 23 is dated May 25, 1942. Exhibit No. 22 was written by Alice Lawrence to her uncle, Arthur Mathewson, residing in Lincoln, and exhibit No. 23 was written to her aunt, Esther Kyler, at Wewela, South Dakota, and her family. The letters were each four pages long, and the first page of each inquired about the health of their families, and then told about the trouble her husband, Dewey, was having about "Grandma's little house," and that it was put up for sale on account of unpaid taxes. Exhibit No. 22 states, beginning on the second page: "and rather than have a stranger buy it, Dewey (my husband) paid off all past taxes & rec'd a clear title to it, by the county. After papa died, I was the only person who took any interest in it & tried my best to keep it rented although it was terribly run down) & I have all the rent money I collected in the bank to be divided among the heirs. This money would have been divided last fall, but immediately after Dewey came into possession of it, Lucy & Louis (her husband) filed suit against us. Now, in this suit, they claim Dewey was acting for you (all) heirs when he bo't it. Of course, this is not true, as each one of you & they to, had the same chance to buy it. However, you do get your share of rent money. Now Uncle Art, Lucy & Louis is just mad because they didn't buy it & they are trying to push the heirs into filing suit against us. I am enclosing a paper which I tho't you would sign, which will show that you & Aunt Grace had nothing to do with Dewey buying the place, & therefore, you expect him to pay you no share, since the deed was made out to him. Of course, all money taken in before the county turned the deed over to Dewey, will be divided among the heirs as soon as this trouble is cleared

up. Dewey is fighting the case against them as he feels as though, since he paid off all indebtedness, the place belongs to him. They claim not & are trying to take the title away from him. If you can take the enclosed paper to a Notary & sign the same, it will be of great assisstance to him in getting this thing cleared up. We have one of these papers already signed by Aunt Tiny & Uncle George. Could you do this immediately & return in stamped envelope which I am enclosing with $1.00 your fee for signature & .50 for Notary. With a lot of gratitude to you & Aunt Grace I am your neice Alice." Exhibit No. 23 is to the same effect.

As a result of her efforts she received a quitclaim deed from Arthur James Mathewson and wife, running to Dewey M. Lawrence, in consideration of one dollar, acknowledged May 29, 1942, another quitclaim deed from her aunt, Esther Carrie Kyler, and husband to Dewey M. Lawrence, dated June 2, 1942, and a quitclaim deed from Ella Lula Atkinson and husband to Dewey M. Lawrence, dated May 23, 1942. The grantors in these three quitclaim deeds later repudiated the deeds after they had learned the true facts, and all filed cross-petitions to cancel the deeds and obtain the same general relief sought by the other heirs.

It is argued in the brief of the appellees that, in writing and negotiating for these deeds and securing them for a nominal sum, in each of which her husband was named as grantor, entire concord of action and understanding is proved between Dewey M. Lawrence and his wife in their general course of conduct in securing the title to this property away from the other heirs. Alice Lawrence in her answer alleged that she acquiesced in and consented to said purchase by her husband, and makes no claim to any interest therein.

In the decree the court finds that the quitclaim deeds of three cross-petitioners were executed in expectation of payment of *pro rata* share of purchase price to vendors, and that the defendant Dewey M. Lawrence held title in trust for the owners of said property just before and at the time the tax deed was obtained from Lincoln county.

The court also finds that Dewey M. Lawrence paid out in purchase of bid, subsequent taxes and recording fee the full sum of $125.93, for which he should receive credit, leaving a balance of $601.04, which he holds in trust for the owners of said property, and that the costs of the action should be taxed jointly against the defendants Dewey M. Lawrence and Alice Lawrence, and should not be paid out of the sums involved, and that judgment be entered in favor of the owners of said real estate in the proportions set out.

The errors relied upon for reversal are that the court erred in finding that Dewey M. Lawrence held the title to said property in trust for the owners thereof, and in entering judgment against him for the profits he made on the transaction.

Complaint is also made of the finding of the court that the three cross-petitioners executed the quitclaim deeds in expectation of receiving a *pro rata* share of the profits of the deal.

The first proposition of law involved is whether a tenant in common may acquire a tax title for his own benefit. The earliest case on the points involved is that of *Brown v. Homan*, 1 Neb. 448, decided by the supreme court of the territory of Nebraska, involving a deed dated April 2, 1856, in which Judge Lockwood said it was not material as to what the nature of the controversy was between Brown and Curtis, as the relation of tenants in common existed between them. "One tenant in common before partition cannot purchase in an outstanding title or incumbrance, on the joint estate, for his exclusive benefit, and use it against his cotenant. The purchase enures to the common benefit, and the purchaser is entitled to contribution."

In the case of *Carson v. Broady*, 56 Neb. 648, 77 N. W. 80, 71 Am. St. Rep. 691, an opinion written by Judge Sullivan reversed the district court for Richardson county, and cited the paragraph just quoted from *Brown v. Homan, supra,* and said "this is believed to be the universal rule" citing 7 Am. & Eng. Ency. of Law (2d ed.) 353, which says: "Where one of several tenants in common, or joint tenants

of land removes a burden resting upon the joint estate, he is entitled to a just contribution from the others, so that the burden may be equal" citing cases in support thereof from England and many states.

Where an estate in lands descended to several heirs as tenants in common, and was sold to foreclose a mortgage given by the ancestor, and was purchased by one of the co-tenants, the latter would be compelled in equity to account to the others as an express trustee, unless it appeared that they had in some manner waived or surrendered their rights. The court said that nothing was better settled in equity jurisprudence than that a cotenant, under such circumstances, could not take to himself individually the benefits of his purchase to the exclusion of his cotenants. See *Tisdale v. Tisdale*, 2 Sneed (Tenn.) 595, 64 Am. Dec. 775.

The authorities appear to approve the general rule that, when one of several co-owners of property acquires a tax title thereto founded on default in the payment of taxes which are a common burden on all, his purchase amounts merely to a payment of the taxes or a redemption from the sale, and gives him no rights against his associates except in so far as they may fail or refuse to contribute to the expenditure so made. See 14 Am. Jur. 123, sec. 54; 54 A. L. R. 896, Annotation.

It is said in *Gilb v. O'Neill*, 225 Ala. 92, 142 So. 397, 85 A. L. R. 1526: "In order to avail themselves of the purchase by a cotenant of an outstanding title to the common property, other cotenants must elect within a reasonable time whether they will contribute to the expense of acquiring such title." And in the A. L. R. annotation thereon cases are cited from many states in support of this rule. See, also, 6 A. L. R. 297, Annotation.

In the case at bar, the husband of a cotenant insists that a husband is not a tenant in common by reason of the fact that his wife is a tenant in common, and there is no obligation growing out of the marriage contract which will invalidate the husband's purchase of the interest of the other tenants in common on sale of the common property for non-payment of taxes.

It is also argued by appellant that, if a husband purchases title of property through tax foreclosure, in which his wife has an interest, and she does not complain, but acquiesces in such purchase, others having interests in the property cannot make complaint because of the husband's acquisition of interests belonging to his wife, citing *Smith v. Casto,* 107 W. Va. 1, 148 S. E. 566, 61 C. J. 1201, and *Ruark v. Harper,* 178 N. Car. 249, 100 S. E. 584. However, we believe the weight of the better authorities holds to the contrary.

In the case of *Willard v. Ames,* 130 Ind. 351, 30 N. E. 210, we find this statement in the text: "It seems to be settled law that a husband, whose duty it is to look after the business interests of his wife and family, as well as to support them, will not be permitted to acquire title to the property of his wife by purchase at a tax sale; * * * ." This statement is quoted with approval by our court in *Winn v. Winn,* 131 Neb. 650, 269 N. W. 376.

In the very old case of *Laton v. Balcom,* 64 N. H. 92, 6 Atl. 37, 10 Am. St. Rep. 381, it is stated: "The obligations and duties of husbands and wives to each other, both express and implied, create such relations of trust and confidence between them that neither can acquire the other's property by a clandestine payment of taxes. Such a seizure of each other's estate, alike inequitable and shocking to the moral sense, is believed to be unsupported by any adjudged case, and would be a palpable violation of the marital contract, which, from its very nature, creates a mutual right of faith in the constant regard of each for the interests and welfare of the other."

"As a general rule, neither husband nor wife can purchase the other's land at a tax sale, nor can a husband gain an interest in land in which his wife owns a life estate when he allows the land to be sold for taxes, by purchasing a deed thereto from the holder of the tax title, and such transaction results in a redemption of the land from the tax sale." 61 C. J. 1200.

"But, although the husband of the tenant in common may

not be able to acquire a valid title under a tax sale, as against the cotenants other than his wife, he nevertheless is entitled to be repaid the whole amount paid as the purchase price under the tax sale, and not merely the portion of the sum represented by the shares of the cotenants other than his wife." 54 A. L. R. 901, Annotation.

As set out in the evidence in the case at bar, when the trial court continued the case on May 19, 1942, to enable Lucy Toole, who was then sole plaintiff, to bring in all the heirs, Alice Lawrence at once co-operated in the scheme of her husband, and entered actively into the plan to save to her husband all of the net profits of $601.04 arising from his purchase of the land at the county foreclosure, based on the delinquent tax for one year of $9.18, which they had failed to pay out of the rents both of them had collected for the heirs, and which foreclosure would have been dismissed as to this property if she had paid the tax out of the money belonging to all the heirs which she still held on hand.

She at once wrote these cotenants, sending them one dollar and notary fee of 50 cents, and a deed made out to her husband, explaining that by this deed they would expedite closing the matter, and implying they would profit thereby. They each relied upon her representations and executed and returned to her the deed. It appears to us that this active co-operation between the husband and wife to keep the other cotenants from sharing in the profits of over $600 which the husband had made on the transaction violates the rules set forth in the cases herein cited.

We find that the trial court was right in the decree, which held, among other things, that defendant Dewey M. Lawrence held the title to this real estate in trust for the owners of said property in the ratio of the proportions and ownerships of each, and said decree is hereby affirmed.

AFFIRMED.